DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email:  millerdou@sec.gov
PETER DEL GRECO (Cal. Bar No. 164925)
Email:  delgrecop@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Jennifer Barry, Acting Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JULIE A. MINUSKIN, DENNIS R. DIRICCO, THOMAS F. CASEY, GOLDEN GENESIS, INC. and JOSHUA P. STOLL,<br><br>Defendants. | Case No.  '22 CV 0483 JO  AGH<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a). because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Thomas F. Casey ("Casey") resides in this district.

## SUMMARY

4.     From in or about January 2012 through in or about December 2019, Dennis R. DiRicco ("DiRicco") and Casey raised over $15 million from investors seeking to invest in their respective companies, Golden Genesis, Inc. ("Golden Genesis") and Until Tomorrow Drivetrains, LLC ("Until Tomorrow").  What investors did not know, however, was that the only significant revenues these companies generated was the money they raised from investors and that all of their other sources of revenue were vastly insufficient to pay investors the ten percent (10%) interest plus principal payments DiRicco and Casey had promised them.  As a result, DiRicco and Casey knew, or were reckless and negligent for not knowing, that the revenues their companies generated were insufficient to make the investor payments and therefore they did so by misusing and misappropriating investor funds (*i.e.* to make Ponzi-like payments), a scheme that was bound to – and eventually did – collapse.

5.     In addition to defrauding investors in this manner, Casey made materially false and misleading statements in Golden Genesis' marketing materials in order to lure investors, claiming that their investments would be secured by the filing of a UCC-1 Financing Statement on all the assets of Golden Genesis.  In reality, Casey never filed the UCC-1 and knew, or was reckless and negligent for not

knowing, that the investments were not secured by the assets of Golden Genesis.

6.      Of the approximately 300 investors defrauded and misled by DiRicco and Casey, all were clients of Retire Happy, LLC ("Retire Happy"), a company that purportedly provided investors with financial education and financial strategies on how to leverage their retirement accounts and create passive income for themselves by participating in "investment opportunities."

7.      Julie A. Minuskin ("Minuskin") owned Retire Happy and, as its sole managing member, was the one who ran its day-to-day operations.  Minuskin used Retire Happy to promote Golden Genesis and Until Tomorrow as investment opportunities to her clients.

8.      Minuskin did this primarily through Joshua P. Stoll ("Stoll"), who worked for Minuskin at Retire Happy as an "account specialist."  At Minuskin's direction, Stoll told investors that the investment opportunities offered by Golden Genesis and Until Tomorrow were "safe and secure."  Unbeknownst to the investors, however, neither Minuskin nor Stoll had conducted due diligence on any of the investment opportunities they promoted to Retire Happy clients and they had no legitimate basis for saying these investments were "safe and secure."

9.      Moreover, Minuskin and Stoll never told investors about their own financial interest in Golden Genesis, or that Retire Happy would receive a large commission – sometimes as high as twelve percent (12%) – based on the amount of money Retire Happy clients invested.  Minuskin also knew, or was reckless and negligent for not knowing, that some of the money that Retire Happy clients invested in these companies would be used to make Ponzi-like payments to other investors (*i.e.,* pay the interest and principal owed to other investors).  Nevertheless, Minuskin aided and abetted DiRicco and Casey in their scheme to defraud investors by failing to tell her Retire Happy clients about the Ponzi-like payments and by continuing to promote Golden Genesis and Until Tomorrow as safe and secure investment opportunities to them.

10.     Finally, DiRicco, Casey, Minuskin and Stoll offered these Golden Genesis and Until Tomorrow securities to Retire Happy clients without registering them with the SEC and without qualifying for any exemptions to the registration requirements.  Similarly, Minuskin and Stoll acted as brokers in these offerings without registering themselves with the SEC and without qualifying for any exemptions to the registrations requirements.  Despite being unregistered, the Golden Genesis and Until Tomorrow offerings raised approximately $10.1 million and $5.9 million from over 200 investors and 100 investors, respectively.  Minuskin received approximately $1.1 million as commissions and Stoll received more than $400,000 as commissions.

11.     By engaging in this conduct:

(a)     Defendants Minuskin, DiRicco, Casey, Golden Genesis, and Stoll each have violated, and may be continuing to violate, the securities registration provisions of Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77f;

(b)     Defendants Minuskin and Stoll each have violated, and may be continuing to violate, the broker-dealer registration provisions of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a);

(c)     Defendant Minuskin has violated, and may be continuing to violate, the antifraud provisions of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b);

(d)     Defendant DiRicco has violated, and may be continuing to violate, the antifraud provisions of Section 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and ((3), and Section 10b of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c);

(e)     Defendants Casey and Golden Genesis have each violated, and may be continuing to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder; and

(f)     Defendant Minuskin aided and abetted, and may be continuing to aid and abet, DiRicco's, Casey's and Golden Genesis' violation of the antifraud provisions of Section 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1) and ((3), and Section 10b of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

12.     With this action, the SEC seeks permanent injunctive relief against all the defendants to prevent future violations of the federal securities laws, disgorgement of any ill-gotten gains, along with prejudgment interests, civil penalties, an officer and director bar against defendants Casey and DiRicco, and a penny stock bar against defendant DiRicco.

## THE DEFENDANTS

13.     Defendant Julie A. Minuskin is a resident of Las Vegas, Nevada and was the sole the managing member and chief executive officer of Retire Happy, a Nevada limited liability company.  She was also the owner and president of Land Jewels, Inc., a Nevada corporation.

14.     Defendant Dennis R. DiRicco is a resident of Camas, Washington and was the chief financial officer and a member of the board of directors of Golden Genesis, a Nevada corporation.  He was also the managing member of Until Tomorrow, a California limited liability company.  In 1989, DiRicco suffered a federal conviction for obstruction of justice and filing a false tax return.  In 2001, he suffered a second federal conviction for obstruction of justice and filing a false tax return.  He previously practiced law in California from 1976 until 1989, before resigning around the time of his first federal conviction with disciplinary charges pending against him.  In 2009, the California Department of Business Organizations ("CDBO"), presently the Department of Financial Protection & Innovation, issued a cease and desist order against DiRicco for antifraud and registration violations.

15.     Defendant Thomas F. Casey is a resident of Rainbow, California and is

the majority owner, chief executive officer, and a member of the board of directors of Golden Genesis, a Nevada corporation. In 1998, Casey reached a settlement with the SEC in the matter of *SEC v. Casey*, Case No. 98-CV-2214 (D.D.C. Sept. 17, 1998), where he agreed, without admitting or denying the allegations, to accept a civil injunction for securities fraud.

16.   Defendant Golden Genesis is a Nevada corporation with its principal place of business in San Marcos, Texas, where it ostensibly operates a plasmapheresis center that collects blood plasma from donors between the ages of 18 and 25 and then sells it for out-of-hospital uses, including anti-aging treatments.

17.   Defendant Joshua P. Stoll is a resident of Las Vegas, Nevada and worked for Retire Happy as an account specialist.

## RELEVANT ENTITIES

18.   Retire Happy was a Nevada limited liability company located in Las Vegas, Nevada. It specialized in self-directed IRAs and educating individuals on how to leverage their retirement accounts and create passive income for themselves by participating in alternative investments.

19.   Land Jewels is a Nevada corporation located in Las Vegas, Nevada. It purportedly provides real estate consulting services in professional, scientific and technical services industries.

20.   Until Tomorrow is a California limited liability company located in Mountain View, California. Its purpose was to pool the funds of investors wanting to participate in the initial public offering ("IPO") of Adomani, Inc. ("Adomani"), a Delaware corporation located in California that designed, manufactured and installed advanced zero-emission electric and hybrid drivetrain systems for use in new school buses and medium to heavy-duty commercial fleet vehicles. It also designed, manufactured and installed unique and patented conversion kits to replace conventional drivetrain systems for diesel and gasoline powered vehicles zero-emission electric or hybrid drivetrain systems.

21.     "RH Custodian" is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  It provides administration, asset custody and related services for self-directed retirement accounts.

## THE VICTIMS

### Retire Happy Clients

22.     In or about January 2012, Minuskin founded Retire Happy to promote self-directed retirement accounts to investors with retirement assets.  Minuskin set up a boiler room inside of Retire Happy's offices and employed sales agents to cold-call investors throughout the United States, including Nevada, Missouri, Maine, and Texas.

23.     As the sole managing member of Retire Happy, Minuskin set the policies and procedures for the company, ran its day-to-day operations, and closely supervised all of its employees.

24.     Minuskin obtained the contact information of investors with retirement assets by having Retire Happy partner with seminar groups that offered courses on investing strategies.  If investors who attended these seminars expressed an interest in some form of alternative investments, such as investing in real estate or precious metals, Retire Happy sales agents would contact them via telephone to follow-up.

25.     If the investors continued to express an interest in alternative investments when Retire Happy sales agents contacted them, the sales agents scheduled an appointment for the investor to speak with Stoll, who identified himself as a Retire Happy "account specialist."  Using documents such as a "Solo 401(k) Debt Solution Report" and other materials prepared by Retire Happy, Stoll would review with investors the benefits of opening up a self-directed retirement account.

26.     Stoll told investors that Retire Happy offered clients financial education and financial strategies on how to leverage their retirement accounts and create passive income for themselves by participating in investment "opportunities" available to Retire Happy clients.  To access these investment opportunities, Retire

Happy clients had to liquidate their existing individual retirement account and transfer those assets to a self-directed IRA.  Stoll offered to have Retire Happy "facilitate" the transfer of the retirement assets to a self-directed IRA and encouraged investors to use RH Custodian, the custodian with which Retire Happy had a professional alliance agreement.

27.    Retire Happy and RH Custodian updated and revised their professional alliance agreement.  Some agreements contained a "minimum production requirement," which required Retire Happy to meet a minimum production requirement of twenty-five (25) new accounts for RH Custodian per month.  In the event that Retire Happy failed to meet this minimum production requirement, RH Custodian had the right to cease paying Retire Happy referral fees for the remainder of the month in which the minimum production requirement was not met.  If the minimum production requirement was not met for a ninety-day (90) period, RH Custodian had the right to terminate the agreement altogether and immediately.

28.    If an investor agreed to have Retire Happy facilitate the transfer of their retirement assets to RH Custodian, which meant Retire Happy became the agent of record on the client's account and filled out the necessary paperwork, Retire Happy received a facilitator fee ranging between $1,000 and $2,000.  The Retire Happy client personally paid this facilitator fee, not RH Custodian, and the client could elect to have the fee paid from the retirement assets they transferred to RH Custodian.

29.    From approximately January 2012 to December 2019, approximately ninety-five percent (95%) of Retire Happy clients agreed to use RH Custodian for the administration of their self-directed IRA and approximately ninety percent (90%) agreed to pay Retire Happy the facilitator fee.

30.    Minuskin, as the owner and controller of Retire Happy, directly and indirectly received the referral fees and the facilitator fees.  Minuskin used these fees and other sources of revenue to pay Stoll a monthly salary of approximately $4,000, as well as to pay for his medical benefits.  Minuskin also gave Stoll approximately

$200 from the $1,000 to $2,000 facilitator fee Retire Happy received.

## THE FRAUD

### A.   Investment in Golden Genesis

31.   In or about April 2016, Minuskin began promoting Golden Genesis as an investment opportunity to her Retire Happy clients.  Minuskin learned about Golden Genesis from DiRicco, who had co-founded Golden Genesis a month earlier with Casey, who the SEC had previously sued for securities fraud.

32.   DiRicco and Casey founded Golden Genesis ostensibly for the purpose of opening and operating plasmapheresis centers that collect blood plasma from donors between the ages of 18 and 25 and sell it for out-of-hospital uses, including anti-aging treatments.

33.   On or about April 1, 2016, Minuskin, on behalf of Retire Happy, and Casey, on behalf of Golden Genesis, entered into what they described as a consulting agreement.  Under the terms of the agreement, Retire Happy agreed to find clients interested in loaning money to Golden Genesis pursuant to a promissory note, where Retire Happy clients would be the "lenders" and Golden Genesis would be the "borrower."  The agreement required Retire Happy to raise $6 million for Golden Genesis within 12 months.  For every Retire Happy client who agreed to make an investment (*i.e.*, enter into a promissory note with Golden Genesis), Golden Genesis agreed to pay Retire Happy a twelve percent (12%) commission, which it based on the gross amount of money each Retire Happy client invested in Golden Genesis.

34.   Minuskin, Casey and DiRicco agreed that ten percent (10%) of this commission would go to Retire Happy and two percent (2%) would go to Land Jewels, another company that Minuskin owned and operated.  Minuskin agreed to kickback the 2% that went to Land Jewels to DiRicco.  Minuskin further agreed to give Stoll 1% of the 10% commission paid directly to Retire Happy.

### B.   Material Misrepresentations to Golden Genesis Investors

35.   In April 2016, around the same time Retire Happy began raising money

for Golden Genesis, Casey created, on behalf of Golden Genesis, a lender brochure that he knew, or was reckless and negligent for not knowing, Minuskin and Stoll would distribute to Retire Happy clients.  The brochure Casey created told investors, among other things, that Golden Genesis would use investor funds to operate plasmapheresis centers strategically located in college communities and that it was seeking $6 million in financing to develop six (6) of these centers within a year.  The brochure Casey created also told investors that the promissory notes would be secured by a UCC-1 Financing Statement on all assets of Golden Genesis, including equipment, inventory, receivables, intellectual property, patents and the bank accounts of Golden Genesis.

36.     The brochure stated that Golden Genesis would pay investors ten percent (10%) interest on the last day of each month and pay the principal loan back in full within two years, but that Golden Genesis had the right to extend this for up to six months.  The brochure also touted Casey's experience as an executive and board member of various companies between 1983 through 2005, including that he had been nominated for Entrepreneur of the Year in 1989 and 1992.

37.     The lending brochure regarding the filing of the UCC-1 was materially false and misleading because Casey knew, or was reckless and negligent for not knowing, that he never intended to file, and never did file, the UCC-1 Financing Statement securing the promissory notes against the assets of Golden Genesis.

38.     The lending brochure also failed to disclose that: (1) Golden Genesis had agreed to pay Retire Happy a 12% commission (2% of which would be kicked back to DiRicco) from investor funds; (2) Minuskin received 1 million shares of stock in the Golden Genesis and had large ownership stake in the company; (3) Casey had been the subject of an SEC civil enforcement action in 1998 alleging he committed securities fraud; and (4) DiRicco had two felony convictions and had been the subject of a 2009 CBDO cease and desist order alleging securities fraud.

39.     In addition to the lending brochure, which Minuskin and Stoll distributed

to Retire Happy clients, Minuskin told Stoll that the Golden Genesis investment was "safe and secure." Stoll repeated this to Retire Happy clients and Minuskin knew, or was reckless and negligent for not knowing, that Stoll would repeat this statement to clients. Minuskin's statement was materially false and misleading because she never conducted due diligence on the investment Golden Genesis was offering to Retire Happy clients and had no legitimate basis for saying the investment was "safe and secure."

40.     On or about January 5, 2018, after Retire Happy raised the initial $6 million it had agreed to raise under the initial consulting agreement, Casey and Minuskin agreed that Retire Happy would raise an additional $1.5 million under the same terms, except Retire Happy agreed to raise this amount within 2 months instead of 12 months.

41.     On or about June 14, 2018, on behalf of Golden Genesis, Casey created another lending brochure that he knew, or was reckless and negligent for not knowing, Minuskin and Stoll would distribute to Retire Happy clients. This time, the brochure Casey created told investors, among other things, that Golden Genesis had successfully opened its "flagship" facility in San Marcos, Texas, where it had a blood bank dedicated to providing the world's highest quality young-plasma for prescribed human infusions. Through the brochure, Casey also told investors that the inventory of plasma at this facility alone was worth $1,145,000. The brochure further told investors that their promissory notes would be secured by a UCC-1 Financing Statement filed against all the assets of Golden Genesis, including its equipment, inventory, receivables, intellectual property, patents and bank accounts. Finally, the brochure told investors that Golden Genesis would exit its loan obligations using "revenue generated funds from business operations."

42.     Once again, the June 14, 2018 lending brochure contained the same material omissions as described above in paragraph 38.

43.     The statement in the June 14, 2018 lending brochure regarding the filing

of the UCC-1 was materially false and misleading because Casey knew, or was reckless and negligent for not knowing, that he never intended to file, and never did file, the UCC-1 Financing Statement securing the promissory notes against the assets of Golden Genesis.

44.    The statement in the brochure regarding how Golden Genesis would exit its loan obligations was materially false and misleading in that Casey knew, or was reckless and negligent for not knowing, that Golden Genesis's business operations had not generated sufficient revenues for it to pay off its loan obligations and that it was using investor funds to pay back other investors.

## C.    The Misuse and Misappropriation of Golden Genesis Investor Funds

45.    In 2016, only $848 of Golden Genesis' revenues came from non-investor funds, while $4,453,200 of its total revenues for that same year came from investor-funded promissory notes.  Over the course of that same year, Golden Genesis made $202,602 in interest payments to investors, and paid $557,507 in commissions to Retire Happy.

46.    In 2017, only $30,253 of Golden Genesis' revenues came from non-investor funds, while $1,736,280 of its total revenues for that same year (or 98.3%) came from investor-funded promissory notes.  Over the course of that same year, Golden Genesis made $543,867 in interest payments to investors, and paid $228,103 in commissions to Retire Happy.

47.    In 2018, only $145,805 of Golden Genesis' revenues came from non-investor funds, while $2,560,075 of its total revenues for that same year (94.6%) came from investor-funded promissory notes.  Over the course of that same year, Golden Genesis made $800,258 in interest payments to investors, and paid $324,718 in commissions to Retire Happy.

48.    In 2019, only $136,464 of Golden Genesis' revenues came from non-investor funds, while $461,500 of its total revenues for that same year (77.2%) came from investor-funded promissory notes. Over the course of that same year, Golden

Genesis made $609,401 in interest payments to investors, and paid $43,320 in commissions to Retire Happy.

49.     With non-investor funds making up such a small percentage of its revenues year-after-year, it could not cover the principal and interest obligations that it owed investors.  Instead, Golden Genesis and Casey began making Ponzi-like payments, where they used investor funds to pay other investors the interest and principal they were owed.

50.     According to Golden Genesis' financial records, between 2016 and 2019, a total of $2.1 million in investor funds were used to make these Ponzi-like payments and this would have been important to a reasonable investor when making the decision to invest in Golden Genesis promissory notes.

51.     Casey and DiRicco knowingly, recklessly and negligently misused and misappropriated $2.1 million in investor funds to pay the principal and interest obligations owed to other investors.  They both knew that Golden Genesis's business operations had not generated sufficient revenues for it to pay off its loan obligations and that it was using investor funds to pay back other investors.  They both had control over and access to Golden Genesis' bank account.  Furthermore, Casey was the one who authorized all of the Ponzi-like payments and DiRicco was the one who transferred many of them to RH Custodian for payment.

52.     Minuskin aided and abetted Golden Genesis, Casey and DiRicco in their misuse and misappropriation of investor funds by continuing to promote Golden Genesis as an investment opportunity to Retire Happy clients, even though she knew, or was reckless for not knowing, that investor funds were being used to make Ponzi-like payments.

53.     For example, on or about August 31, 2018, Minuskin received an email from Casey saying he still had not received funds from an investor and so he was getting worried about being able to send the interest payments he owed to other investors.

COMPLAINT                                                13

54.    On or about November 30, 2018, Minuskin received an email from Casey saying that he was expecting to bring in $100,000 in investor funds to cover that month's interest payments to other investors.

55.    On or about December 13, 2018, Minuskin received an email from Stoll telling Casey that he would receive $40,000 from an investor and that Casey should send $20,000 of it to another investor who wanted his funds returned.

56.    On or about May 22, 2019, Minuskin received an email from Stoll saying he was working on getting investors to invest with Golden Genesis so Casey could begin using their funds to pay off investor principal and interest.

**D.    Investment in Until Tomorrow**

57.    In or about July 2016, Minuskin began promoting Until Tomorrow to her Retire Happy clients as another investment opportunity.  Like Golden Genesis, Minuskin learned about Until Tomorrow from DiRicco, who had created Until Tomorrow for the purpose of pooling the funds of investors who wanted to participate in the initial public offering of Adomani.  This company purportedly designed, manufactured and installed advanced zero-emission electric and hybrid drivetrain systems for use in new school buses and medium to heavy-duty commercial fleet vehicles.

58.    Minuskin had direct and indirect control over Until Tomorrow, as well as an ownership stake and access to its financial records.

59.    On or about December 13, 2016, Until Tomorrow held its first organizational meeting and DiRicco elected "S.S.," the bookkeeper for Retire Happy, as its managing member.  Minuskin knew that S.S. was elected as the managing member of Until Tomorrow because DiRicco told her around the same time that this happened.

60.    On December 14, 2016, Minuskin became an authorized signer on Until Tomorrow's Wells Fargo bank account, giving Minuskin access to Until Tomorrow bank records and giving her authority to conduct bank transactions on its behalf.  The

authorization form falsely designated Minuskin as the "President" of Until Tomorrow, which Minuskin falsely acknowledged when she signed her name underneath that designation.

61.    Minuskin also received a fifty percent (50%) ownership stake in Until Tomorrow, while DiRicco received a 30 percent (30%) ownership stake and another Retire Happy employee, "T.M.", received a twenty percent (20%) ownership stake.

62.    Around the time Retire Happy began promoting Until Tomorrow to its clients, Minuskin, on behalf of Retire Happy, and DiRicco, on behalf of Until Tomorrow, entered into a Finder's Fee Agreement.  Like with Golden Genesis, under the terms of this agreement, Retire Happy agreed to find clients interested in loaning money to Until Tomorrow pursuant to a promissory note, where Retire Happy clients would be the "lenders" and Until Tomorrow would be the "borrower."  The agreement required Retire Happy to raise between $2 million and $4 million for Until Tomorrow.  For every Retire Happy client who agreed to make an investment (*i.e.*, enter into a promissory note with Until Tomorrow), Until Tomorrow agreed to pay Retire Happy a twelve percent (12%) commission, which it based on the gross amount of money each Retire Happy client invested in Golden Genesis.

63.    Minuskin, Casey and DiRicco agreed that ten percent (10%) of this commission would go to Retire Happy and two percent (2%) would go to Land Jewels, another company that Minuskin owned and operated.  Minuskin agreed to kick back the 2% that went to Land Jewels to DiRicco.  Minuskin further agreed to give Stoll 1% of the 10% commission paid directly to Retire Happy.

**E.    Material Misrepresentations to Until Tomorrow Investors**

64.    In December 2016, Retire Happy began raising money for Until Tomorrow.  As she had done for Golden Genesis, Minuskin told Stoll that the Until Tomorrow investment was "safe and secure."  Stoll repeated this to Retire Happy clients and Minuskin knew, or was reckless and negligent for not knowing, that Stoll would repeat this statement to clients.  Minuskin's statement was materially false and

misleading because she never conducted due diligence on the investment Until Tomorrow was offering to Retire Happy clients and had no legitimate basis for saying the investment was "safe and secure."

## F.     The Misuse and Misappropriation of Until Tomorrow Investor Funds

65.     Despite Minuskin's assurance that Until Tomorrow investments were safe and secure, DiRicco immediately began using investor funds to pay back other investors.  Between in or about December 2016 and in or about February 2017, 100 percent of Until Tomorrow's revenues (approximately $5.9 million) came from investor-funded promissory notes.

66.     With all of Until Tomorrow's revenues coming from investor funds year-after-year, DiRicco could not cover the principal and interest obligations that were owed investors without making Ponzi-like payments, where he used investor funds to pay other investors the interest and principal they were owed.

67.     According to Until Tomorrow's financial records, between in or about January 2017 and in or about May 2018, a total of $3.2 million in investor funds were used to make these Ponzi-like payments and this would have been important to a reasonable investor when making the decision to invest in Until Tomorrow promissory notes.

68.     DiRicco knew, or was reckless and negligent for not knowing, that he misappropriated $3.2 million in investor funds to pay the principal and interest obligations owed to other investors.  He had control over and access to Until Tomorrow's bank account.  Furthermore, DiRicco authorized all of the Ponzi-like payments and was the one who transferred them to RH Custodian for payment.

69.     Minuskin aided and abetted DiRicco's misappropriation of investor funds by causing Stoll to tell investors that an investment in Until Tomorrow was safe and secure when, in reality, she had no legitimate basis for making this statement. She further aided and abetted DiRicco's misappropriation by continuing to promote Until Tomorrow as an investment opportunity to Retire Happy clients, even though

she knew, or was reckless for not knowing, including through her access to Until Tomorrow's bank account, that investor funds were being used to make Ponzi-like payments.

**G.** **Minuskin, DiRicco, Casey and Golden Genesis Acted With Scienter and Negligence**

70.     Minuskin knew, or was reckless and negligent for not knowing, that her statements regarding investments in Golden Genesis and Until Tomorrow being "safe and secure" were false and misleading because she had done no due diligence on the investments and had no legitimate basis for making these statements.  Minuskin also knew, or was reckless and negligent for not knowing, that Stoll would repeat this statement to Retire Happy clients because she ran Retire Happy's day-to-day operations of Retire Happy, knew Stoll's position as an account specialist and because she closely supervised him in that position.

71.     Minuskin knew, or was reckless for not knowing, that she aided and abetted Casey and DiRicco in their misappropriation of investor funds because she instructed Stoll to tell Retire Happy clients that Golden Genesis and Until Tomorrow were safe and secure investments when, in reality, she had no legitimate basis for making this statement.  She further aided and abetted their misappropriation by continuing to promote Golden Genesis and Until Tomorrow as investment opportunities to Retire Happy clients, even though she received emails stating that investor funds were being used to pay other investors and even though she had access to bank records that revealed these Ponzi-like payments.

72.     DiRicco, whose knowledge and conduct are imputed to Golden Genesis, knowingly, recklessly and negligently misappropriated $2.1 million in Golden Genesis investor funds and $3.9 million in Until Tomorrow investor funds to pay the principal and interest obligations owed to other investors.  He knew that Golden Genesis and Until Tomorrow did not have sufficient revenues to pay off its loan obligations without using other investors' funds and was the one who either

authorized or transferred the payments to other investors.

73.     Moreover, DiRicco had twice been convicted of federal felonies involving fraud and deceit.  In September 1989, DiRicco suffered a federal conviction for conspiracy to defraud the United States, obstruction of justice, and aiding and abetting the preparation of false tax returns.  These offenses involved providing tax advice to an individual engaged in drug sales and relaying information to other parties who then destroyed drugs that were the subject of an investigation. They also involved DiRicco preparing a tax return for another client that contained a false tax deduction.  DiRicco received a sentence of five years' probation for this conviction.

74.     In November 2000, DiRicco suffered his second federal conviction after pleading guilty to a violation of 26 U.S.C. § 7212, interference with the due administration of internal revenue laws.  The specific conduct for which Mr. DiRicco was convicted consisted of failing to file his 1993 Form 1040 personal return and failing to file his 1992 and 1993 Form 1120 corporate returns.  For this conviction, DiRicco received a sentence of four months of custody followed by four months of home detention.

75.     In 2009, the CDBO issued a cease and desist order against DiRicco for securities fraud and registrations violations.  It alleged, among other things, that DiRicco offered and sold securities in California subject to qualification under the Corporate Securities Law, without such offers or sales first being qualified or exempt, in violation of Corporations Code section 25110.  It further alleged that those offers and sales of securities were made by means of written or oral communications that included untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Corporations Code section 25401.  Finally, it alleged that DiRicco had conducted business as a broker-dealer or investment adviser without having first obtained a certificate authorizing such activities, in violation of sections 25210 and 25230 of the California Corporations Code.

76.     Casey, whose knowledge and conduct are imputed to Golden Genesis, knew, or was reckless and negligent for not knowing, that his statement in the lending brochure regarding the filing of the UCC-1 was materially false and misleading because he never intended to file, and never did file, the UCC-1 Financing Statement securing the promissory notes against the assets of Golden Genesis.

77.     Casey knew, or was reckless and negligent for not knowing, that his statement regarding how Golden Genesis would exit its loan obligations using revenues generated from its business operations was false and misleading because he had access to Golden Genesis' financial records and knew its business operations were insufficient to pay off its loan obligations.

78.     Casey knowingly, recklessly and negligently misappropriated $2.1 million in investor funds to pay the principal and interest obligations owed to other investors because he knew that Golden Genesis's business operations had not generated sufficient revenues for it to pay off its loan obligations and was the one who authorized using investor funds to pay back other investors.

## THE REGISTRATION VIOLATIONS

79.     The promissory notes that Golden Genesis and Until Tomorrow offered and sold to Retire Happy clients were securities.  Each investor invested money in a common enterprise, namely the development of plasmapheresis center and the participation in the IPO of Adomani, with the expectation of a ten percent (10%) profit in the form of interest that was to be derived from the efforts of others.

80.     Indeed, on or about July 18, 2016, not long after Minuskin and Stoll began promoting Golden Genesis as an investment opportunity to Retire Happy clients, a consultant Minuskin had hired told Minuskin, DiRicco and Casey that it was his opinion the promissory notes Golden Genesis was offering should be treated as securities.  The consultant said his opinion would not change unless Minuskin or Golden Genesis secured a legal opinion from an attorney stating they did not constitute the selling of securities.

81.    Minuskin, DiRicco and Casey never obtained a legal opinion from an attorney stating that the promissory notes being offered by Golden Genesis were not securities.

82.    Nevertheless, between in or about April 2016 and in or about August 2019, Golden Genesis raised approximately $10.1 million from over 200 Retire Happy investors.  Minuskin, DiRicco, Casey, Golden Genesis and Stoll, directly and indirectly, offered and sold these securities on behalf of Golden Genesis, and Minuskin and Stoll each received commissions for doing so.

83.    Similarly, between in or about December 2016 and in or about February 2017, Until Tomorrow raised approximately $5.9 million from over 100 Retire Happy investors.  Minuskin, DiRicco, and Stoll, directly and indirectly, offered and sold these securities on behalf of Until Tomorrow and Minuskin and Stoll received commissions for doing so.

84.    Minuskin, DiRicco, Casey, Golden Genesis and Stoll each directly and indirectly offered and sold the promissory notes of Golden Genesis and Until Tomorrow without ever registering them with the SEC.  No registration statements were ever filed for these offerings and no exemptions from registration were available.

85.    The offer and sale of Golden Genesis and Until Tomorrow were made to investors throughout the United States, including Nevada, Missouri, Maine, and Texas.  None of the Defendants made any effort to determine the sophistication or accreditation of the investors and none of the investors were given access to the kind of information that SEC registration would reveal, such as audited financial statements.

86.    Minuskin directly and indirectly participated in the unregistered offer and sale of Golden Genesis and Until Tomorrow securities by setting up a boiler room inside the offices of Retire Happy and hiring a team of sales agents to cold-call investors throughout the United States, including Nevada, Missouri, Maine, and

Texas.

87.     Stoll directly and indirectly participated in the unregistered offer and sale of Golden Genesis and Until Tomorrow securities by working as an "account specialist" inside the boiler room at Retire Happy, where he spoke with investors and promoted Golden Genesis and Until Tomorrow securities as safe and secure investments.

88.     DiRicco directly and indirectly participated in the unregistered offer and sale of Until Tomorrow securities by negotiating and drafting the terms of the consulting agreement between Retire Happy and Until Tomorrow, and by signing the promissory notes on behalf of Until Tomorrow.

89.     Golden Genesis and Casey, whose knowledge and conduct are imputed to Golden Genesis, directly and indirectly participated in the unregistered offer and sale of Golden Genesis securities by creating the lending brochures that Minuskin and Stoll distributed to investors, and by signing the promissory notes on behalf of Golden Genesis.

90.     Minuskin and Stoll each acted as unregistered brokers of Golden Genesis and Until Tomorrow and did not qualify for any exemptions from registration, because they both received transaction-based compensation from Golden Genesis and Until Tomorrow.  Minuskin received approximately $1.1 million in commissions and Stoll received approximately $400,000 in commissions.

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Casey and Golden Genesis)**

91.     The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

92.     Defendants Casey and Golden Genesis each defrauded and made materially false and misleading statements to investors about the filing of an UCC-1 Finance Statement and exiting loan obligations through revenue from business operations when, in fact, they knew, or were reckless and negligent for not knowing, that they never intended to file a UCC-1 Finance Statement and that they were using investor funds to pay the interest and principal owed to other investors.

93.     By engaging in the conduct described above, Defendants Casey and Golden Genesis, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

94.     By engaging in the conduct described above, Defendants Casey and Golden Genesis each violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

### SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendant DiRicco)**

95.    The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

96.    Defendant DiRicco defrauded investors by misappropriating and misusing investor funds to pay the principal and interest obligations owed to other investors (*i.e.*, to make Ponzi-like payments), payments which DiRicco knew, or was reckless and negligent for not knowing, would have been important to a reasonable investor when making the decision to invest in Golden Genesis and Until Tomorrow promissory notes.

97.    By engaging in the conduct described above, Defendant DiRicco directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

98.    By engaging in the conduct described above, Defendant DiRicco violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

### THIRD CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

**(against Defendants Casey and Golden Genesis)**

99.   The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

100.   Defendants Casey and Golden Genesis each defrauded and made materially false and misleading statements to investors about the filing of an UCC-1 Finance Statement and exiting loan obligations through revenue from business operations when, in fact, they knew, or were reckless and negligent for not knowing, that they never intended to file a UCC-1 Finance Statement and that they were using investor funds to pay the interest and principal owed to other investors.

101.   By engaging in the conduct described above, Defendants Casey and Golden Genesis, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

102.   By engaging in the conduct described above, Defendants Casey and Golden Genesis violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

1
2
3
4

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act

### (against Defendant DiRicco)

5
6

103.   The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

7
8
9
10
11
12

104.   Defendant DiRicco defrauded investors by misappropriating and misusing investor funds to pay the principal and interest obligations owed to other investors (*i.e.*, to make Ponzi-like payments), payments which DiRicco knew, or was reckless and negligent for not knowing, would have been important to a reasonable investor when making the decision to invest in Golden Genesis and Until Tomorrow promissory notes.

13
14
15
16
17
18

105.   By engaging in the conduct described above, Defendant DiRicco, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

19
20
21

106.   By engaging in the conduct described above, Defendant DiRicco violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIFTH CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against Defendant Minuskin)**

107.   The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

108.   Defendant Minuskin made materially false and misleading statements to investors about Golden Genesis and Until Tomorrow being safe and secure investments when, in fact, she knew, or were reckless and negligent for not knowing, that she never conducted due diligence on these investment opportunities promoted to Retire Happy clients and had no legitimate basis for saying this.

109.   By engaging in the conduct described above, Defendant Minuskin, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

110.   By engaging in the conduct described above, Defendant Minuskin violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

## SIXTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendant Minuskin)

111.   The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

112.   Defendant Minuskin obtained approximately $1.1 million in commissions by making materially false and misleading statements to investors about Golden Genesis and Until Tomorrow being safe and secure investments when, in fact, she knew, or were reckless and negligent for not knowing, that she never conducted due diligence on these investment opportunities promoted to Retire Happy clients and had no legitimate basis for saying this.

113.   By engaging in the conduct described above, Defendant Minuskin, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.   By engaging in the conduct described above, Defendant Minuskin violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

1
2
3
4

## SEVENTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Minuskin, DiRicco, Casey, Golden Genesis and Stoll)

5
6

115.   The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

7
8
9

116.   The Golden Genesis and Until Tomorrow offerings were never registered with the SEC, and no exemptions from the registration requirements applied to them.

10
11
12
13
14
15
16
17
18

117.   By engaging in the conduct described above, Defendants Minuskin, DiRicco, Casey, Golden Genesis and Stoll, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

19
20
21
22

118.   By engaging in the conduct described above, Defendants Minuskin, DiRicco, Casey, Golden Genesis and Stoll have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

23
24
25
26
27
28

## EIGHTH CLAIM FOR RELIEF

**Unregistered Broker-Dealer**

**Violation of Section 15(a) of the Exchange Act**

**(against Defendants Minuskin and Stoll)**

119. The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

120. Defendants Minukin and Stoll each acted as unregistered brokers by, among other things, offering and agreeing to provide broker-dealer services in exchange for transaction-based compensation, including a percentage of funds raised, without being registered with the SEC.

121. By engaging in the conduct described above, Defendants Minuskin and Stoll, and each of them, made use of the mails and means or instrumentalities of interstate commerce to effect transactions in, and induced and attempted to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances, or commercial bills) without being registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

122. By engaging in the conduct described above, Defendants Minuskin and Stoll have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## NINTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of**

**17(a)(1), and 17(a)(3) of the Securities Act and**

**Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c)**

**(against Defendant Minuskin)**

123.    The SEC realleges and incorporates by reference paragraphs 1 through 90 above.

124.    Defendant Minuskin aided and abetted Defendants DiRicco, Casey and Golden Genesis in their schemes to defraud and their material misrepresentations to investors.  By continuing to promote Golden Genesis and Until Tomorrow as investment opportunities to Retire Happy clients, even though she knew, or was reckless for not knowing, that investor funds were being used to make these Ponzi-like payments, Minuskin knowingly or recklessly provided substantial assistance to Defendants DiRicco, Casey and Golden Genesis in their above violations.

125.    By reason of the conduct described above, Defendant Minuskin violated Sections 17(a)(1), and 17(a)(3) of the Securities Act, and Section 10(b) of the Exchange Act, and subsections (a) and (c) of Rule 10b-5 thereunder, by knowingly and recklessly providing substantial assistance to, and thereby aided and abetted Defendants DiRicco, Casey and Golden Genesis in their primary violations of Sections 17(a)(1), and 17(a)(3) of the Securities Act, and Section 10(b) of the Exchange Act, and subsections (a) and (c) of Rule 10b-5 thereunder.

126.    Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and subsections (a) and (c) of Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

# PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants Minuskin, DiRicco, Casey, Golden Genesis and Stoll committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Minuskin, Casey, and Golden Genesis and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining DiRicco and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(1) and (2) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Minuskin, DiRicco, Casey, Golden Genesis and Stoll, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Minuskin and Stoll and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. §§ 78o(a)].

## VI.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VIII.

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], bar Defendants DiRicco and Casey from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IX.

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendant DiRicco from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**X.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**XI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  April 8, 2022

*/s/ Douglas M. Miller*
DOUGLAS M. MILLER
Attorney for Plaintiff
Securities and Exchange Commission