UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>JULIE MINUSKIN et al.,<br><br>　　　　　　　　　　Defendants. | Case No.:  22-cv-483-RSH-AHG<br><br>**ORDER DENYING MOTION FOR DEFAULT JUDGMENT WITHOUT PREJUDICE**<br><br>[ECF No. 18] |

On April 8, 2022, Plaintiff Securities and Exchange Commission (the "SEC") filed a complaint against Defendants Julie A. Minuskin, Dennis R. DiRicco, Thomas F. Casey, Golden Genesis, Inc., and Joshua P. Stoll alleging violations of the Securities Act of 1933 ("Securities Act"), Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 thereunder. ECF No. 1.

On September 15, 2022, the SEC filed the pending motion for default judgment against Defendants Minuskin and Stoll, both of whom failed to appear in the action. ECF No. 18. The SEC seeks default judgments imposing both injunctive and monetary relief. For Minuskin, the SEC seeks a permanent injunction prohibiting future violations of antifraud and registration securities laws—specifically, Section 17(a) of the Securities Act,

15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j; Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77f; and Section 15(a) of the Exchange Act, 5 U.S.C. § 77o(a). *Id.* at 2. The SEC also seeks against Minuskin disgorgement in the amount of $1,180,556 with prejudgment interest of $328,172.77 and imposition of the maximum civil penalty, as determined by the Court. *Id.* For Stoll, the SEC seeks a permanent injunction prohibiting future registration violations of Section 5(a) and (c) of the Securities Act and Section 15(a) of the Exchange Act, in addition to disgorgement in the amount of $531,025 with prejudgment interest of $147,615.13 and the imposition of the maximum civil penalty, as determined by the Court. *Id.*

For the reasons discussed below, the motion for default judgment against Minuskin and Stoll is denied without prejudice.

I.   **FACTUAL ALLEGATIONS**[1]

According to the SEC, from 2012 to 2019, Defendants DiRicco and Casey raised over $15 million from investors seeking to invest in their respective companies, Golden Genesis, Inc. ("Golden Genesis") and Until Tomorrow Drivetrains, LLC ("Until Tomorrow").[2] ECF No. 1 (Compl.) ¶ 4. However, the only significant revenues these companies generated was the money raised from investors and all their other sources of

---

[1]   The Court accepts the allegations in the Complaint as true. *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987) ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").

[2]   DiRicco and Casey cofounded Golden Gensis ostensibly for the purpose of opening and operating plasmapheresis centers that collect blood plasma and sell it for out-of-hospital uses. Compl. ¶¶ 16, 32. DiRicco created Until Tomorrow for the purpose of pooling funds from investors who wanted to participate in the initial public offering ("IPO") of Adomani, Inc., a company that purportedly made zero-emission electronic and hybrid drivetrain systems. *Id.* ¶¶ 20, 57

revenue were insufficient to pay investors the ten percent interest plus principal payments DiRicco and Casey had promised. *Id.* ¶¶ 4, 38.

### A.     Minuskin and Stoll's Involvement in the Golden Genesis Investment

Minuskin learned about Golden Genesis from DiRicco and began promoting it in or about April 2016 as an investment opportunity to the clients of her company, Retire Happy. *Id.* ¶ 31. Retire Happy specialized in self-directed IRAs and educating individuals on how to leverage their retirement accounts and create passive income by participating in alternative investments. *Id.* ¶ 18. As its sole managing member, Minuskin set the policies and procedures for Retire Happy and ran its day-to-day operations. *Id.* ¶¶ 7, 23. She also employed Stoll as an "account specialist," who would be connected to the clients that expressed an interest in alternative investments.[3] *Id.* ¶¶ 8, 25.

On or about April 1, 2016, Minuskin on behalf of Retire Happy, and Casey on behalf of Golden Gensis, entered into a "consulting agreement." *Id.* ¶ 33. Under this agreement, Retire Happy agreed to find clients interested in loaning money to Golden Genesis pursuant to a promissory note, where Retire Happy clients would be the "lenders" and Golden Genesis would be the "borrower." *Id.* The agreement required Retire Happy to raise $6 million for Golden Genesis within 12 months, and for every Retire Happy client that agreed to invest, Golden Genesis agreed to pay Retire Happy a 12 percent commission. *Id.* Minuskin, Casey, and DiRicco agreed that ten percent of the commission would go to Retire Happy and two percent would go to Land Jewels, another company that Minuskin owned and operated. *Id.* ¶ 34. Minuskin agreed to kick back the two percent that went to Land Jewels to DiRicco. *Id.* Minuskin further agreed to give Stoll one percent of the commission paid to Retire Happy. *Id.*

---

[3]     If investors wanted to access the investment opportunities promoted by Retire Happy, they had to liquidate their existing individual retirement account and transfer those assets to a self-directed IRA. *Id.* ¶ 26. Stoll offered clients to have Retire Happy "facilitate" this and encouraged investors to use RH Custodian, the custodian with which Retire Happy had a professional alliance agreement. *Id.*

### B. Material Misrepresentations to Investors

Casey created Golden Genesis's lending brochures, which contained materially false and misleading information. *Id.* ¶¶ 5, 35, 41. Among other things, these brochures claimed that investments would be secured by the filing of a UCC-1 Financing Statement on all Golden Gensis's assets; that Golden Genesis would pay investors ten percent interest monthly and pay the principal back in full within two years (although Golden Gensis had the right to extend this for up to six months); and that Golden Gensis would exit its loan obligations using "revenue generated funds from business operations." *Id.* ¶¶ 5, 35–36, 41. However, these brochures failed to disclose (1) the consulting agreement between Casey and Minuskin; (2) the commissions being paid to Minuskin; or (3) the SEC's prior securities fraud actions against Casey and DiRicco. *Id.* ¶¶ 38, 42. Further, Casey did not intend to file and never filed the UCC-1 Financing Statement. *Id.* ¶¶ 5, 37, 43. Nor had Golden Genesis's business operations generated enough revenue to pay off its loan obligations. *Id.* ¶ 44.

Minuskin and Stoll distributed the brochures that Casey made to Retire Happy clients. *Id.* ¶¶ 39, 41. And despite having conducted no due diligence on the Golden Gensis investment, Minuskin told Stoll that it was "safe and secure," which Stoll then repeated to clients. *Id.* At no point did Minuskin or Stoll tell investors about their own financial interest in Golden Genesis, or that Retire Happy would receive a commission based on the amount of money Retire Happy clients invested. *Id.* ¶ 9.

### C. Misuse and Misappropriate of Investor Funds

Golden Genesis's financial records between 2016 to 2019 showed that a total of $2.1 million in investor funds were used to pay other investors the interest and principal they were owed. *Id.* ¶¶ 49–50. Casey and DiRicco, who both had control over and access to Golden Genesis's bank account, knew that funds were being used this way and that revenues were not enough to pay off loan obligations. *Id.* ¶ 51. For her part, Minuskin aided and abetted Casey, DiRicco, and Golden Genesis by continuing to promote the Golden Genesis investment to Retire Happy clients, even though she knew, or was reckless for not

knowing, that investor funds were being misused and misappropriated. *Id.* ¶ 52. For example, Minuskin received an email from Casey on or about August 31, 2018, saying that Casey still had not received funds from an investor and was getting worried about being able to send the interest payments he owed to other investors. *Id.* ¶ 53. Minuskin received a similar email on or about May 22, 2019, in which Stoll said he was working on getting investors to invest with Golden Genesis so Casey could begin using their funds to pay off investor principal and interest. *Id.* ¶ 56.

### D. Minuskin and Stoll's Involvement in the Until Tomorrow Investment

In or about July 2016, Minuskin and Stoll also began promoting Until Tomorrow as another investment opportunity. Compl. ¶ 57. Minuskin received a 50 percent ownership stake in Until Tomorrow and had access to its bank records.[4] *Id.* ¶¶ 60–61. Minuskin and Stoll engaged in similar conduct in connection with Until Tomorrow as they did with Golden Genesis, including promoting it on behalf of DiRicco and telling Retire Happy clients the investment was "safe and secure" without any legitimate basis for that representation. *See id.* ¶¶ 57–69.

As with Golden Gensis, Minuskin and DiRicco, on behalf of their respective companies, entered into an agreement where Retire Happy agreed to find clients interested in loaning money to Until Tomorrow. *Id.* ¶ 62. The agreement required Retire Happy to raise between $2 million to $4 million for Until Tomorrow, and Retire Happy would receive a 12 percent commission for every client that agreed to make an investment. *Id.* Again, Retire Happy received ten percent of this commission, of which one percent would be paid to Stoll, and Land Jewels received two percent of the commission, which Minuskin agreed to kick back to DiRicco. *Id.* ¶ 63.

//

//

---

[4] DiRicco received a 30 percent ownership stake in Until Tomorrow and another unnamed Retire Happy employee received the remaining 20 percent. *Id.* ¶ 61.

### E. Registration Violations

DiRicco, Casey, Minuskin, and Stoll offered Golden Gensis and Until Tomorrow securities to Retire Happy clients without registering them with the SEC and without qualifying for any exemptions to the registration requirements. *See id.* ¶¶ 10, 79–90. Minuskin and Stoll both participated in the unregistered offer and sale of these securities— Minuskin by setting up a boiler room inside the offices of Retire Happy and hiring a team of sales agents to cold call investors, and Stoll by working there as an "account specialist." *Id.* ¶¶ 86–87. Minuskin and Stoll also acted as brokers in these offerings without registering or qualifying for an exemption. *Id.* ¶ 90.

Despite this, Golden Genesis and Until Tomorrow offerings raised approximately $10.1 million and $5.9 million from over 300 investors, all of whom were Retire Happy clients. *Id.* ¶¶ 6, 10. Minuskin received approximately $1.1 million as commissions, and Stoll received more than $400,000 in commissions. *Id.* ¶ 90.

## II. LEGAL STANDARD

If a party fails to participate in and defend against a federal lawsuit, Federal Rule of Civil Procedure 55 creates a two-step process for that party's adversary to ask the court to enter a judgment against the nonparticipating party by default. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Second, the party seeking relief from the court must request entry of default judgment from the court. Fed. R. Civ. P. 55(b).

It is within the Court's discretion to enter default judgment following entry of default by the Clerk. *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *see also PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) ("A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment."). The Ninth Circuit has identified several factors (collectively the "*Eitel* factors") the Court may consider before entering default judgment:

(1) the possibility of prejudice to the plaintiff;

> (2) the merits of plaintiff's substantive claim;
> (3) the sufficiency of the complaint;
> (4) the sum of money at stake in the action;
> (5) the possibility of a dispute concerning material facts;
> (6) whether the default was due to excusable neglect; and
> (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id.* at 1471–72.

The general rule is that default judgments are "ordinarily disfavored," and "[c]ases should be decided upon their merits whenever reasonably possible." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016) (citing *Eitel*, 782 F.2d at 1472). Consequently, "the party seeking default judgment has the burden of establishing that the requested relief is appropriate." *Khraibut v. Chahal*, No. 15-CV-04463-CRB, 2021 WL 1164940, at *16 (N.D. Cal. Mar. 26, 2021) (citing *NewGen*, 840 F.3d at 617 and *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977)).

## III. ANALYSIS

Here, the SEC has sought and obtained a clerk's entry of default against Minuskin and Stoll, thereby satisfying the first part of Rule 55. ECF Nos. 13–15. In moving for entry of default judgment, the SEC argues that the *Eitel* factors weigh its favor. ECF No. 18-1 at 7–18. The SEC dedicates a large portion of its argument to the merits of its claims and the sufficiency of the Complaint. *See id*. ¶¶ 8–16.

The Court concludes in its discretion, however, that default judgment is not appropriate at this time. *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) ("The district court's decision whether to enter a default judgment is a discretionary one."). Significantly, the SEC's claims remain pending against Defendants Casey and Golden Genesis.[5] *See* Compl. ¶¶ 91–94, 99–102, 115–18 (the first, third, and seventh claims). As

---

[5] On April 28, 2022, the Court entered judgment against Defendant DiRicco, upon his and the SEC's joint motion for entry of a consent judgment. ECF Nos. 3, 6.

the factual allegations above indicate, these two Defendants were closely involved with Minuskin and Stoll in the alleged scheme to defraud Retire Happy clients. A default judgment against Minuskin and Stoll on these claims could lead to "logically inconsistent results" if the other Defendants ultimately prevail. *See J & J Sports Prods., Inc. v. Pagliaro*, No. 1:12-CV-001507-LJO, 2013 WL 4402808, at *2 (E.D. Cal. Aug. 15, 2013) (citing *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001)).

Further, the SEC has not established prejudice necessitating entry of default judgment against Minuskin and Stoll at this stage. The SEC states that in the absence of a default judgment, the SEC "will be unable to fulfill its mandate to protect the investing public." *See* ECF No. 18-1 at 8. However, the Court's denial of the pending motion at this stage does not mean the SEC will be without recourse in this lawsuit. *See J & J Sports Prods.*, 2013 WL 4402808, at *2 ("Where the parties are similarly situated the district court should withhold granting default judgment until the action is resolved on the merits against the non-defaulting defendants, and if the non-defaulting defendants prevail, the action should be dismissed against both the defaulting and non-defaulting defendants.") (citing *Frow v. De la Vega*, 82 U.S. 552, 554 (1872)). The SEC identifies no other grounds for prejudice.

Accordingly, the Court denies the SEC's motion for default judgment without prejudice to renewal.

## IV.   CONCLUSION

For the reasons stated above, the SEC's Motion for Default Judgment against Defendants Minuskin and Stoll (ECF No. 18) is **DENIED** without prejudice.

**IT IS SO ORDERED**.

Dated:  August 17, 2023

Hon. Robert S. Huie
United States District Judge