1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9        SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11 SECURITIES AND EXCHANGE COMMISSION, | Case No.: 22-cv-483-RSH-AHG |
| 12 Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART PLANTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| 13 v. | |
| 14 JULIE MUNISKIN, et al., | |
| 15 Defendants. | [ECF No. 40] |
| 16 | |

Plaintiff Securities and Exchange Commission ("the SEC") moves for summary judgment against defendants Thomas F. Casey and Golden Genesis, Inc. ("Golden Genesis"). Defendants filed an opposition and the SEC filed a reply. ECF Nos. 43, 48. On March 21, 2024, the Court heard oral argument in this matter. For the reasons below, the Court grants in part and denies in part the SEC's motion for summary judgment.

# I. BACKGROUND

## A. Factual Background[1]

Defendant Minuskin is a resident of Las Vegas, Nevada who formed an entity called Retire Happy in 2012 to allow individuals to establish self-directed retirement accounts. ECF No. 49 at 1. Minuskin owned Retire Happy, monitored its bank accounts, and retained final authority over its actions. *Id.* at 2. Retire Happy was never licensed as a broker-dealer or an investment advisor, nor did it make efforts to determine whether its lenders were accredited investors. *Id.* at 3. Instead, Retire Happy directed clients to Provident Trust Group, LLC ("Provident Trust"), a full-service trust company, which would accept the transfer of clients' 401(k) accounts and administer each client's self-directed retirement plan by wiring money to clients' chosen borrowers. *Id.* at 20. Under Retire Happy and Provident Trust's April 2012 Professional Alliance Program Referral Agreement, Retire Happy would receive a $100 referral fee each time one of its clients opened a Provident Trust account. *Id.* at 3. Retire Happy would also receive $495 of the facilitation fee clients paid to transfer their accounts to Provident Trust. *Id.* at 6-7.

To facilitate clients' choice in how to allocate their funds, Retire Happy provided its clients brochures about lending opportunities with interested borrowers. *Id.* at 4. One such borrower, Golden Genesis, set out to be the first blood bank in the world to provide human plasma from young donors for out-of-hospital uses. *Id.* at 8. Golden Genesis was founded by defendants Dennis DiRicco and Thomas Casey. Casey is a resident of Rainbow, California and has served as the majority owner, chief executive officer, and member of the board of directors of Golden Genesis since May 18, 2016. *Id.*

In April 2016, Golden Genesis and Retire Happy agreed that Retire Happy would raise $6 million for Golden Genesis over the course of 12 months. *Id.* at 11. Casey sent

---

[1] The following facts are drawn from the joint statement of undisputed material facts submitted by the Parties. ECF No. 49.

Minuskin a 10-page brochure about Golden Genesis and entered into an agreement that entitled Retire Happy to a 12-percent fee based on the amount of money Retire Happy clients invested in Golden Genesis. *Id.* at 4, 9-10. The brochure advertised that clients providing loans would receive a monthly ten-percent interest payment on the amount they invested and would receive their principal back in 24 months. ECF No. 39-4 at 16. The brochure also stated that Golden Genesis's promissory notes would be secured by the assets of Golden Genesis through a UCC-1 Financing Statement. ECF No. 49 at 10. Defendant Joshua Stoll, an employee of Retire Happy, sent this brochure to clients and told them Golden Genesis was a "safe and secure" investment because the investments were secured by collateral. *Id.* at 8. Casey was not aware of any written representations Retire Happy made to its clients. *Id.* at 10.

With the help of these investments, on November 14, 2017, Golden Genesis opened its first blood bank facility in San Marcos, Texas. *Id.* In 2018, when Golden Genesis ran out of money, Retire Happy agreed to raise an additional $3 million. *Id.* at 11. In a January 9, 2018 email to Minuskin and Terry McDonald, Retire Happy's Chief Operating Officer, Casey stated that "Notes are secured by a promissory note along with the original notes, a UCC-1 on all assets of G[olden] G[enesis], including equipment, receivables and bank accounts." *Id.* at 21; ECF No. 48-16 at 3. Despite these statements, Casey never filed a UCC-1 Financing Statement on behalf of Golden Genesis. ECF No. 49 at 21.

Ultimately, Golden Genesis issued 238 promissory notes and raised about $9.3 million from the retirement accounts of Retire Happy clients based in Nevada, California, Indiana, and Texas. *Id.* at 12, 20, 25. The promissory notes were modeled on a template that contained the amount invested, the interest rate, the term of the note, and the borrower's information. *Id.* at 7. They also indicated that they were "secured by a UCC-1 Financing Statement on all assets of Holder, including, but not limited to, equipment, inventory, receivables, intellectual property, patents, and bank accounts." *Id.* at 25; *see also*

ECF No. 39-4 at 21-29. The notes each identify Golden Genesis as the "Borrower" and Provident Trust as the "Holder." ECF No. 49 at 25.

Between 2016 and 2019, Golden Genesis did not have sufficient business revenue to pay back the principal and monthly interest obligations that it owed to promissory-note lenders. *Id.* at 21-22. Instead, it used funds it had received from other promissory-note lenders to make these payments. *Id.* According to the SEC, Golden Genesis returned $2,080,518 to investors in the form of interest payments but did not pay back their principal investments. *See* ECF No. 39 at 11.

### B. Procedural Background

On April 8, 2022, the SEC filed a complaint against Defendants Julie A. Minuskin, Dennis R. DiRicco, Thomas F. Casey, Golden Genesis, and Joshua P. Stoll alleging violations of the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act"), and Rule10b–5 thereunder. ECF No. 1.

On December 18, 2023, the SEC filed a Motion for Summary Judgment on Claims One, Three, and Seven of the complaint—the claims against the remaining defendants, Casey and Golden Genesis.[2] ECF No. 39.

The Motion first contends that Defendants violated Section 17(a) of the Securities Act and Section 10(b) and Rule 10b–5 of the Exchange Act. ECF No. 39-1 at 11. Section 17(a) prohibits fraud in the offer or sale of securities, while Section 10(b) and Rule 10b–5 prohibit fraud in connection with the purchase or sale of any security. The SEC argues that the evidence demonstrates as a matter of law that Casey and Golden Genesis (1) made materially false and misleading statements to their investors by promising that notes were

---

[2]    On April 28, 2022, the Court approved a consent judgment as to defendant DiRicco. ECF No. 6. On July 29, 2022, a clerk's default was entered against defendants Minuskin and Stoll for failing to respond to the SEC's complaint. ECF No. 15.

secured by a UCC-1 Financing Statement against Golden Genesis's assets and (2) misappropriated investor funds by using them to pay other investors' interests. *Id.* at 1-2.

Secondly, the SEC argues that Defendants violated Sections 5(a) and 5(c) of the Securities Act, which prohibit the direct or indirect sale of securities unless a registration statement is in effect. The SEC notes that neither Golden Genesis nor Retire Happy ever registered the offering. ECF No. 39-1 at 22-23.

Defendants oppose the SEC's Motion, arguing that the promissory notes Golden Genesis issued are not securities and that, even if they were, there are disputed issues of fact as to Defendants' scienter that preclude summary judgment. *See* ECF No. 43 at 1-4.

## II.    LEGAL STANDARD

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (quoting *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1277 (9th Cir. 2017)); Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

A party moving for summary judgment "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). Once met, the opposing party "must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). In ruling on a motion for summary judgment, a court "cannot resolve any disputed questions of material fact" and "must view all of the facts in the light most favorable to the non-moving party." *Albino v. Baca*, 747 F.3d 1162, 1173 (9th Cir. 2014) (en banc).

III.    **LEGAL BACKGROUND**

A.    **Liability under Section 17(a), Section 10(b), and Rule 10b–5**

Section 17(a), Section 10(b), and Rule 10b–5 "forbid making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce." *S.E.C. v. Cole*, No. 17-56196, 2024 WL 445335, at *1 (9th Cir. Feb. 6, 2024) (quoting *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001)).

A violation of Section 17(a), Section 10(b), and Rule 10b–5 is established if the defendant (1) made a material misrepresentation or omission (2) in connection with the purchase of a sale or security (3) with scienter (4) in interstate commerce. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010). Scienter can be established by intent, knowledge, or deliberate recklessness. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990) (en banc). "[D]eliberate recklessness involves an extreme departure from the standards of ordinary care that presents a danger of misleading buyers or sellers that is so obvious that the spokesperson must have been aware of it." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 952 (9th Cir. 2023) (quotations omitted). Violations of Sections 17(a)(2) and (3) require a lesser showing of negligence.[3] *S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).

B.    **Liability under Section 5**

Sections 5(a) and 5(c) of the Securities Act "make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration." *Platforms Wireless Int'l Corp.*, 617 F.3d at 1085; 15 U.S.C. § 77e(a), (c).

---

[3]    Section 17(a)(1) prohibits "employ[ing] any device, scheme, or artifice to defraud" while Section 17(a)(2) and (a)(3) prohibit "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact" and "engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q.

"To establish a prima facie case for violation of Section 5, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce." *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013). Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption. *S.E.C. v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980).

## IV.    DISCUSSION

### A.    Whether the Promissory Notes Were Securities

As a threshold matter, the SEC characterizes the promissory notes Golden Genesis issued to Retire Happy clients as securities while Defendants claim the notes are commercial loans exempt from the securities laws. "Whether a particular instrument is a security is ultimately a question of law, but where there are disputed facts, the issue may be one for the jury." *Shaper v. Zadek*, 557 F. Supp. 3d 969, 975 (N.D. Cal. 2021); *see also Great W. Bank & Tr. v. Kotz*, 532 F.2d 1252, 1255 (9th Cir. 1976). Accordingly, should genuine disputes of material fact exist as to whether the promissory notes are securities, summary judgment is improper.

The Securities Exchange Act contains a rebuttable presumption that "[t]he term 'security' means any note." 15 U.S.C. § 78c(a)(1). The Supreme Court has indicated that to rebut the presumption, a Court must "inquire first whether the promissory note bears a 'family resemblance' to a judicially-created list of non-security instruments. If so, then the note is not a security." *S.E.C. v. Wallenbrock*, 313 F.3d 532, 536 (9th Cir. 2002) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 67 (1990)).[4] Promissory notes that are on the judicially-crafted list of exceptions include the following:

_____

[4]    A different "family resemblance" test is used for "notes" and "investment contracts." *See Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990) (introducing family resemblance test,

> "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, ... a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[,]" [and] "notes evidencing loans [made] by commercial banks for current operations [of borrowers]."

*Zadek*, 557 F. Supp. 3d at 977 (quoting *Reves*, 494 U.S. at 65)). As for this last category, the Ninth Circuit has noted that "commercial loans for current operations are made to allow a borrower to continue 'to operate a business smoothly during a period when cash inflows and outflows do not match up.'" *McNabb v. S.E.C.*, 298 F.3d 1126, 1131 (9th Cir. 2002).

*Reves* instructs that if a note does not strongly resemble these enumerated exceptions, a court must consider four more factors: (1) the "motivations that would prompt a reasonable seller and buyer to enter into" the transaction; (2) the "plan of distribution" of the instrument; (3) the "reasonable expectations of the investing public"; and (4) "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument." *See Wallenbrock*, 313 F.3d at 537 (quoting *Reves*, 494 U.S. at 67). "Failure to satisfy one of the factors is not dispositive; they are considered as a whole." *Wallenbrock*, 313 F.3d at 537.

### 1.    *Family Resemblance*

As a preliminary matter, the SEC contends that the promissory notes do not resemble any of the notes on the judicially-crafted list of exceptions. Defendants argue that the

---

and explaining that "[w]e reject the approaches of those courts that have applied the *Howey* test to notes; *Howey* provides a mechanism for determining whether an instrument is an 'investment contract'"). Because this case concerns promissory notes, the Court applies the Supreme Court's *Reves* test rather than the test for "investment contracts" described in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 297 (1946).

promissory notes bear a "family resemblance to commercial loans for current operations." ECF No. 43 at 6-7. Defendants assert only conclusory arguments as to this resemblance and do not explain how the loans were strictly short-term and commercial in nature. *See id.* ("It is no great stretch to so construe the Golden Genesis Promissory Notes."). Additionally, the loans at issue here were made by numerous individual retirees rather than by a commercial bank. Because Defendants have not rebutted the presumption that the notes in question are a security, the Court proceeds to the *Reves* factors.

### 2. Reves *Factors*

The first *Reves* factor considers the parties' motivation. Namely, "[i]f the seller's purpose is to raise money for the general use of a business enterprise . . . the instrument is likely to be a 'security.'" *Reves*, 494 U.S. at 66. On the other hand, if the note "is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, . . . the note is less sensibly described as a 'security.'" *Id.* The SEC argues the promissory notes here fall into the former category, *see* ECF No. 39-1 at 13-14; Defendants contend the latter category applies because the Retire Happy clients here were making bridge loans in "fixed amounts" and "had no interest in the profits or losses of the venture or any control over the venture." ECF No. 43 at 9.

The SEC argues that Golden Genesis and Casey's purpose in seeking loans was for the general use of the business enterprise. The brochure Casey sent to Retire Happy represented that Golden Genesis was seeking $6 million to develop six plasmapheresis centers, each of which Golden Genesis projected to generate $17 million annually. ECF No. 39-4 at 15. This was a description of the entirety of the purported business of Golden Genesis. The funds were therefore solicited for the general use of Golden Genesis, rather than to facilitate the purchase and sale of a minor asset or consumer good, to correct for cash-flow deficiencies, or to advance some other specific commercial or consumer purpose. Additionally, the SEC points to evidence that investors were motivated by the

high 10% monthly interest rate, which "indicates that profit was the primary goal of the lender," suggesting that the notes were intended as securities rather than short-term loans. *See Stoiber v. S.E.C.*, 161 F.3d 745, 750 (D.C. Cir. 1998) (evidence that profit was the primary goal of the lender because of a favorable, above-prime interest rate suggests a note is a security). At oral argument, Defendants' counsel agreed that the interest rate would likely be the most appealing aspect of the deal to a prospective lender. Defendants do not identify record evidence establishing that there is a disputed issue of material fact as to the parties' motivation. Accordingly, the Court concludes that the first *Reves* factor favors the SEC.

The second *Reves* factor considers the plan of distribution for the instrument: "if a note is 'offered and sold to a *broad segment of the public*,' that 'establish[es] the requisite common trading in an instrument.'" *Zadek*, 557 F. Supp. 3d at 979 (quoting *Reves*, 494 U.S. at 68). Defendants contend the notes were not publicly distributed because they were executed between "a closed circle of potential lenders" rather than an "open offering of securities to the general public" and "there was no market for the notes, and they could not be traded or be the subject of speculation." ECF No. 43 at 9-10. It is undisputed that Golden Genesis entered into over 200 promissory note agreements with individuals located in Nevada, California, Indiana, and Texas. ECF No. 49 at 20. Although the notes were not made in an open offering to the general public, they were available to Retire Happy's unvetted clients and not a closed set of sophisticated parties. *See S.E.C. v. Zada*, 787 F.3d 375, 381 (6th Cir. 2015) ("If notes are sold to a wide range of unsophisticated people, as opposed to a handful of institutional investors, the notes are more likely to be securities."). At oral argument, Defendants' counsel estimated that there were over 100 investors, and stated that as far as Golden Genesis was aware, these investors were not screened in any way. Because of the volume and widespread distribution of the loans and the availability of loans to retirees not screened for their sophistication as investors, this factor favors the SEC. *See S.E.C. v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1128 (9th Cir. 1991)

(finding notes were "offered and sold to a broad segment of the public" where defendant raised $2 million "from at least 148 investors in several states"); *see also Wright v. Downs*, 972 F.2d 350 (6th Cir. 1992) (finding "there was common trading to a broad public segment" where notes were offered to "more than 200 people" throughout a community).

The third *Reves* factor evaluates whether notes are reasonably perceived as securities by the investing public. *See Reves*, 494 U.S. at 66. Here, a court considers "whether a reasonable member of the investing public would consider these notes as investments" rather than as short-term loans. *Wallenbrock*, 313 F.3d at 539 (noting this factor is "closely related to the first factor"); *see also Stoiber*, 161 F.3d at 751 ("Whether notes are reasonably perceived as securities generally turns on whether they are reasonably viewed by purchasers as investments."). While this factor "allows notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are," it does not "allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws." *Stoiber*, 161 F.3d at 751 (describing the third factor as a "one-way ratchet"). The SEC argues that the high monthly interest rate to be paid over the course of 24 months in conjunction with the way in which Retire Happy marketed the promissory notes—as "safe and secure"—supports a finding that a reasonable person would believe them to be investments rather than short-term loans. ECF No. 39 at 15. Defendants argue that there is no evidence clients were ever told they were investing in Golden Genesis's business and point to a disclaimer on the final page of the Golden Genesis brochure, which states that "[t]his presentation belongs exclusively to Golden Genesis, Inc., a Nevada Corporation. It does not imply an offering of securities." *See* ECF No. 39-4 at 19. The Court concludes that this factor favors neither party.[5]

_____

[5]    Defendants also argue that there is no reason to consider the reasonable expectations of the investing public because the notes were never offered publicly. ECF No. 43 at 10-

1    The fourth and final *Reves* factor considers the adequacy of regulatory schemes other

2   than the federal securities laws. Defendants argue Retire Happy clients are adequately

3   protected because common law contract and fraud protections are available to them. ECF

4   No. 43 at 12-13. At oral argument, Defendants' counsel offered that the alternative

5   regulatory scheme here is Nevada's Uniform Commercial Code.

6    In support of this argument, Defendants request judicial notice of records from two

7   Nevada state court cases involving Golden Genesis to illustrate the existence of a

8   comprehensive regulatory scheme. *See* ECF No. 45. Although the Court takes judicial

9   notice of the state courts' decisions in *Garceau v. Golden Genesis, Inc., et al.*, Case No. A-

10  21-832722-C and *Shroyer v. Golden Genesis, Inc., et al.*, Case No. A-21-829437-C, these

11  non-binding cases do not support the conclusion that the fourth *Reves* factor favors

12  Defendants. In *Garceau*, the state court ruled that the promissory notes were not securities

13  under the Nevada Uniform Securities Act and eventually dismissed the case for failure to

14  prosecute. *See* ECF Nos. 45-2, 45-3. In *Shroyer*, the state court applied Article 3 of the

15  Uniform Commercial Code and dismissed claims against Golden Genesis for lack of

16  standing. ECF No. 45-3. The Court is unpersuaded that Nevada's Uniform Commercial

17  Code is a sufficient alternative regulatory scheme. *See, e.g.*, *United States v. Nordlicht*, No.

18  16-CR-00640 (BMC), 2019 WL 286895, at *3 (E.D.N.Y. Jan. 22, 2019) (rejecting the

19  argument that the existence of the New York Uniform Commercial Code and the New

20  York Penal Law provides a sufficient regulatory scheme "in light of the scope and

21  sophistication of defendants' alleged misconduct"). To the contrary, "the fact that a

22

23  _____

24  11. Defendants cite no controlling law for this argument, and the district court opinions on

25  which they rely involve far fewer investors and do not make such a holding. *See Chao Xia
    Zhang -Kirkpatrick v. Layer Saver LLC*, 84 F. Supp. 3d 757, 765 (N.D. Ill. 2015) (finding

26  this factor neutral for a loan opportunity offered to two people); *Intelligent Digital Sys.,
    LLC v. Visual Mgmt. Sys., Inc.,* 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010) (concerning the

27  sale of technology from one business to another for a lump sum).

28

company is subject to regulation by a single state is not nearly enough to remove the company from the umbrella of the federal securities laws." *Wallenbrock*, 313 F.3d at 540. Defendants fail to identify an "alternative regulatory regime" that is "comprehensive" and instead rely on "a patch-work of state regulation, which applies to most business entities in some fashion or another, [and] cannot displace the federal regime." *Id*. This factor weighs in favor of the SEC.

The Court concludes that Defendants have not rebutted the presumption that the notes were securities.

### B.    Whether Genuine Issues of Material Fact Exist as to Casey's Scienter

The SEC moves for summary judgment under Section 17(a), Section 10(b), and Rule 10b–5—Claims One and Three of the Complaint—under two theories. The first theory is that (1) Casey made material misrepresentations to investors regarding filing a UCC-1 financing statement (2) in connection with the sale of securities (3) with scienter and (4) using the instrumentalities of interstate commerce, including via wire transfers, email, and the mail. ECF No. 39-1 at 16-18.

The SEC's second theory under Sections 17(a)(1) and 17(a)(3) is that (1) Casey "committed a manipulative and deceptive act in furtherance of a scheme" by using investor funds "to make Ponzi-like payment interest payments to other investors, creating the appearance that Golden Genesis was a profitable business and to enable himself and Golden Genesis to raise money from other investors" (2) in connection with the sale of securities (3) knowingly and (4) using the instrumentalities of interstate commerce, including via wire transfers, email, and the mail. ECF No. 39-1 at 18-21.

Defendants dispute only the scienter element of these theories and argue that genuine issues of material fact as to Casey's scienter preclude summary judgment. The SEC argues that the undisputed facts establish that Casey's conduct was, at the least, "knowing or reckless."

As discussed above, Section 17(a), Section 10(b), and Rule 10b–5 forbid making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce. *See Phan*, 500 F.3d at 907–08. Violations of Section 17(a)(1), Section 10(b), and Rule 10b–5 require scienter while violations of Sections 17(a)(2) and (3) require a showing of negligence.[6] *See id.* Scienter "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud." *Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir.), amended, 335 F.3d 1096 (9th Cir. 2003).

In moving for summary judgment under Section 17(a), Section 10(b), and Rule 10b–5, the SEC claims that the undisputed facts establish scienter. The SEC's motion does not argue that those facts additionally or alternatively establish negligence. Accordingly, the Court addresses scienter rather than negligence.

In assessing the element of deliberate recklessness, "the essential inquiry" is whether Casey's actions were "highly unreasonable" and "constitute[d] an extreme departure from standards of reasonable care." *Hollinger*, 914 F.2d at 1570. Reckless conduct must be something more egregious than even "white heart/empty head" good faith and represents an extreme departure from the standards of ordinary care such that the defendant must have been aware of it. *Id.* A court "may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter, [but] the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010); *cf.* Restatement (Second) of Torts § 526 cmt. d ("The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is

---

[6]    Although the SEC states its second theory under Sections 17(a)(1) and 17(a)(3), it argues Casey acted knowingly rather than negligently. *See* ECF No. 39-1 at 19 ("Casey essentially bragged . . . that he knew from the day of the first loan that Golden Genesis's only ability to pay lenders the interest they were owed was through the other loans . . . ."). The Court accordingly does not address whether Casey acted with negligence.

not enough to impose liability . . . but it is evidence from which his lack of honest belief may be inferred."). "When the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk.'" *Platforms Wireless Int'l Corp.*, 617 F.3d at 1094 (quoting *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)).

Whether a defendant acted with scienter is a "subjective inquiry," which ultimately "turns on the defendant's actual state of mind." *Gebhart*, 595 F.3d at 1042. As a result, "[s]ummary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984). Where a "defendant presents affidavits or other evidence establishing a lack of scienter, the plaintiff must come forward with some affirmative showing." *Id.*

### 1. False and Misleading Statements

The brochure describing Golden Genesis that Casey sent to Retire Happy in April 2016 contained a "Loan Summary" section, stating in its entirety:

**Loan Summary**

**Seeking $6,000,000 Loan to**

**GOLDEN GENESIS, INC.**

**Amount loaned:**

Up to Six Million Dollars ($6,000,000)

**Interest Rate:**

Ten Percent (10%) simple interest paid on the last day of each month.

**Loan Repayment and Interest Payments:**

Funding will be in different amounts and at different dates. Each loan is due two years from the date received by Golden Genesis, Inc. (GG). The loan may be extended at the option of GG for six months.

**Security:**

> Notes are secured by a promissory note and a UCC-1 Financing Statement on all assets of Golden Genesis, Inc., including equipment, inventory (together with a rolling, multi-million dollar, 60 – 90 day supply of plasma at each operational facility), receivables, intellectual property, patents, and bank accounts. Copies of the UCC-1 will be sent to the lenders once filed.

ECF No. 39-4 at 16; ECF No. 49 at 13. It is also undisputed that on May 18, 2016, during the first meeting of Golden Genesis's board of directors, Casey stated that promissory notes would be secured against the assets of Golden Genesis. ECF No. 49 at 18. After running out of funds almost two years later, on January 9, 2018, Casey sent an email to Minuskin and McDonald stating that "Notes are secured by a promissory note along with the original notes, a UCC-1 on all assets of G[olden] G[enesis], including equipment, receivables and bank accounts." *Id.* at 20-21. The Parties agree that neither Casey nor Golden Genesis ever filed a UCC-1 Financing Statement. *Id.* at 21.

Here, even crediting Casey's declaration, Casey knew that a statement that "notes are secured by a promissory note and a UCC-1 Financing Statement on all assets of Golden Genesis" would be false, as soon as the first such note was signed and Golden Genesis had not in fact filed a UCC-1 Financing Statement on all of its assets.

At issue, instead, is whether Casey knew that such a statement was being made to investors. Casey himself repeatedly made the representation – in the April 2016 sales brochure he sent to Retire Happy, in the first Golden Genesis board meeting in May 2016, and in his January 2018 email to Retire Happy seeking additional funding. Casey states in his declaration that he did not know what representations Retire Happy in turn made to its retirees. ECF No. 44 ¶¶ 3-4 ("Minuskin told me it was not my business and that whatever was discussed was between her, Provident, and her Provident loan administration clients, was confidential.").

Absent additional facts, it would be a virtual certainty that the representation Casey made about loans being secured by a UCC-1 Financing Statement on all the assets of Golden Genesis would be communicated to retirees. The ten-page brochure that Casey prepared for Retire Happy was the only document that he provided about the company. ECF No. 49 at 10. The "loan summary" section was brief – less than half a page – and the representation about a security interest, far from being fine print in a lengthy prospectus, was one of the very few terms of the loan proposal. Casey testified in his deposition that this brochure was "very specific for Provident," and "just to see if they had an interest," ECF No. 50-2 at 8-9, and his declaration states that "I restricted the distribution of the pitch only to Provident," ECF No. 44 ¶ 7, although he does not explain how he effected such a restriction, which does not appear in the document itself. Regardless, Casey's only representation of the loan terms, made to Retire Happy with the intent that Retire Happy provide it in turn to the Provident, was made in circumstances in which it was highly likely that either Retire Happy, or Provident, or both, would convey those same representations to their clients. This likelihood was only increased with Casey's subsequent iterations of the same false representation about security.

Here, however, there is an additional fact of significance – the language of the actual promissory notes signed by Golden Genesis. These promissory notes were drafted by Provident, rather than by Golden Genesis. They were signed by each individual investor (as "Lender") and by Provident (as "Holder"), and bore the signature of Casey for Golden Genesis (as "Borrower"). Each two-page note provided:

> SECURITY INTEREST. This note is secured by UCC-1 Financing Statement on all assets of Holder, including, but not limited to, equipment, inventory, receivables, intellectual property, patents, and bank accounts.

ECF No. 49 at 25-26, ECF No. 39-4. In reciting that the note was secured by the assets of "Holder," the note was referring to the assets of Provident, rather than the assets of Golden

Genesis. The Parties agree that when "Casey first saw the promissory note come back and realized it said the UCC-1 Statement would be secured by the assets of the Holder, which the promissory note identified as Provident Trust, he was in a state of shock. He did not look a gift horse in the mouth." ECF No. 49 at 11. The Parties also agree that "Casey believed that Provident, not Golden Genesis, was responsible for ensuring that the security interest on the Golden Genesis Promissory Notes was made available or documented." *Id.* at 24.

Viewing the facts in the light most favorable to Casey and Golden Genesis as the non-moving parties, a reasonable juror might conclude that Casey believed that retirees, to the extent they were being told anything about security for the notes, would be told something consistent with the notes that the retirees thereafter signed – namely, that the notes were secured by the assets of Provident. If this was indeed Casey's belief, a reasonable juror might also conclude that Casey did not act with scienter, but instead believed that whatever offer of security he had made at the outset of seeking financing in 2016, and again in 2018, had been rejected or superseded in favor of an alternative security arrangement. Although the SEC has ample basis to attack the credibility of such an assertion at trial, the Court concludes that granting summary judgment to the SEC is not warranted under this theory. *See S.E.C. v. M & A W., Inc*., 538 F.3d 1043, 1055 (9th Cir. 2008) ("[S]ummary judgment is singularly inappropriate where credibility is at issue.").

### 2. Scheme to Defraud

The SEC's second theory is that "Casey committed a manipulative and deceptive act in furtherance of a scheme when he used over $2 million of investor funds to make Ponzi-like interest payments to other investors, creating the appearance that Golden Genesis was a profitable business and to enable himself and Golden Genesis to raise money from other investors." ECF No. 39-1 at 19. Casey concedes that he "knew from the day of the first loan that Golden Genesis's only ability to pay lenders was through the loans that it received," ECF No. 49 at 13. Accordingly, between 2016 and 2019, Golden Genesis had

to "cover the principal and interest obligations that it owed to promissory note lenders . . . using the funds it had received from [other] promissory note lenders." *Id.* at 21.

Defendants respond that the facts are insufficient to establish Casey's scienter. ECF No. 43 at 20. They also rely on Casey's declaration that he has not profited personally from Golden Genesis's business. ECF No. 44 ¶ 11.

In arguing that it is entitled to summary judgment, the SEC relies on several decisions, none of which compel such an outcome. ECF No. 39-1 at 19. *See Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) (describing Ponzi schemes in connection with determining whether a transfer was voidable under California law); *S.E.C. v. Capital Cove Bancorp, LLC*, No. SACV 15-980-JLS, 2015 WL 9704076, at *6 (C.D. Cal. 2015) (noting that "Defendants' use of Ponzi-like payments to hide their insolvency from those investing in their Funds" was evidence, along with numerous misrepresentations, supporting issuance of a preliminary injunction); *S.E.C. v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1214 (D. Utah 2007) (granting summary judgment to the SEC and finding a scheme to defraud where, among other facts, "[c]lients were told that their money would be safe, segregated, and handled in accordance with the strategies outlined in their [Master Financial Plan]" and where Defendant "failed to inform his investors that their money would be used to pay for such things as [his] own personal expenses, the operating expenses and obligations of [Defendant's firm], unauthorized investments in high-risk start-up companies, and the funding of a massive Ponzi scheme"); *S.E.C. v. Sullivan*, 68 F. Supp. 3d 1367, 1378 (D. Colo. 2014) (granting summary judgment where defendant "committed six deceptive acts in furtherance of the [] Ponzi scheme" including "taking personal payouts," "generating false quarterly reports," and "making false and misleading statements to two investors"); *S.E.C. v. Traffic Monsoon, LLC,* 245 F. Supp. 3d 1275, 1300 (D. Utah 2017), aff'd sub nom. *Sec. & Exch. Comm'n v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) (granting preliminary injunction to the SEC where defendant "falsely claim[ed]" that his business "did not constitute a Ponzi scheme" and "suggested that the returns were

generated by business revenue rather than by other investments"). Viewing the facts in the light most favorable to Casey, he neither made false statements to investors, knew that others were making false statements to investors, or received any personal profit from the promissory notes. A reasonable juror could conclude that, even if interest payments under those notes were due long before Golden Genesis had any revenues, Defendants did not participate in a scheme to defraud with the requisite scienter. The Court denies summary judgment to the SEC on Claims One and Three.

### C.    The SEC's Remaining Claim

The SEC also moves for summary judgment on Claim Seven of the Complaint—that Defendants violated Sections 5(a) and 5(c) of the Securities Act, which prohibits the direct or indirect sale of securities unless a registration statement is in effect. *See* 15 U.S.C. §§ 77e(a), 77e(c). The SEC argues Defendants violated these provisions by failing to register the promissory notes as securities. ECF No. 39-1 at 22.

A prima facie violation of Section 5 exists when "(1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce." *CMKM Diamonds, Inc.*, 729 F.3d at 1255. Section 5 is a strict liability offense and does not require a showing of scienter. *Id.* at 1256.

As to the first element, this Court has already found that the promissory notes constitute securities, and it is undisputed that they were never registered as such. *See* ECF No. 49 at 12 ("Golden Genesis never registered its offering and sale of the promissory notes with the SEC."); *see also* ECF No. 48-6 (Casey testifying "No, we never registered the notes"). Second, it is also undisputed that Golden Genesis indirectly offered and sold securities through Retire Happy. *See* ECF No. 39-4 at 16 (Golden Genesis brochure seeking $6 million in loans and offering ten percent monthly interest); ECF No. 49 at 8 (describing how Stoll sent Golden Genesis's brochure to Retire Happy investors); *id.* at 11 (describing how Retire Happy agreed to raise an additional $3 million for Golden Genesis in 2018).

Third, it is undisputed that these sales or offers to sell were made via phone calls and email exchanges and that some notes were sold to out-of-state investors "in places such as California, Indiana and Texas." ECF No. 49 at 20; *see also id.* at 22 ("Golden Genesis exchanged interstate communications with Retire Happy in connection with the promissory notes, including sending and receiving emails via the internet"); *id.* at 5-6, 8 (describing how Stoll sent Retire Happy clients the Golden Genesis brochures via email); ECF No. 48-5 at 35 (Stoll testifying he sent prospective investors the Golden Genesis brochure). Because phone calls and emails are channels of interstate commerce and it is undisputed that promissory notes were sold to out of state investors, the third element of Section 5 is satisfied. *See United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) ("Telephones are instrumentalities of interstate commerce . . ."); *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate commerce." (quotations omitted)).

Defendants fail to respond to the SEC's arguments and have therefore "conceded these claims." *See Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 984 (N.D. Cal. 2014); *see also Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) (noting that a party abandoned claims not defended in opposition to a motion for summary judgment). Based on the undisputed facts, the promissory notes were unregistered securities, Defendants directly or indirectly sold or offered to sell these unregistered securities, and the sales or offers to sell were made through interstate commerce. Accordingly, the Court concludes that Defendants violated Sections 5(a) and 5(c) of the Securities Act and grants summary judgment to the SEC on Claim Seven.

## V. CONCLUSION

For the above reasons, the Court **GRANTS** the SEC's motion for summary judgment as to Claim Seven and **DENIES** the motion as to Claims One and Three.[7]

**IT IS SO ORDERED.**

Dated: March 25, 2024

_Robert S. Huie_

Hon. Robert S. Huie
United States District Judge

---

[7] Given this disposition, the Court denies as moot Defendants' evidentiary objections to the declarations and exhibits submitted by the SEC, ECF No. 46. "[A]s a general rule, most relevance-based evidentiary objections are moot in the context of summary judgment motions. This is because at summary judgment, the question is whether there are genuine disputes of material fact, and accordingly, the relevance inquiry inheres throughout the determination of summary judgment motions" _S.E.C. v. Criterion Wealth Mgmt. Servs., Inc.,_ 599 F. Supp. 3d 932, 945 (C.D. Cal. 2022).